<hr />

## RATH v. TRANSIT DEVELOPMENT CO.

(Supreme Court, Appellate Division, Second Department. May 1, 1912.)

1. MASTER AND SERVANT (§§ 101, 102*)—SAFE APPLIANCES—INJURY TO EMPLOYÉ—LIABILITY OF MASTER.

Where the master exercised the care of an ordinarily prudent man for his own safety, and caused plans for the apparatus to be prepared by engineers of experience and repute, and to be executed by contractors of experience and ability, he was not liable for the death of an employé from the bursting of a steam pipe, though the pipe was not properly equipped with devices for draining off water; the master not being an insurer of the servant, nor a guarantor to him of the work of the designer or constructor of the plant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 174, 178, 179, 180–184, 192; Dec. Dig. §§ 101, 102.*]

2. MASTER AND SERVANT (§ 270*)—INJURY TO EMPLOYÉ—ADMISSION—IMPROVEMENT TO APPARATUS.

In an action for the death of an employé from the bursting of a steam pipe, the fact that, after the installment of the plant, the master caused the pipe to be equipped with a second device for drawing off water, was not an admission that the apparatus as originally installed was defective.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 913–927, 932; Dec. Dig. § 270.*]

3. MASTER AND SERVANT (§§ 101, 102*)—SAFE APPARATUS—INJURY TO SERVANT—LIABILITY OF MASTER.

Where the master exercises due diligence to have his plant properly constructed, he is not liable for the death of an employé merely because he may have erred in judgment, and could have furnished a safer apparatus, or because the apparatus furnished lacked devices which could have prevented the accident.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 174, 178–184; Dec. Dig. §§ 101, 102.*]

<hr />

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. APPEAL AND ERROR (§ 175*)—SCOPE OF REVIEW.

Where a case is submitted without objection or demurrer upon only two features of negligence, the appellate court will not consider a third feature to uphold the verdict.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1137–1140; Dec. Dig. § 175.*]

Appeal from Trial Term, Kings County.

Action by Frederick L. Rath, as administrator, etc., of Charles Johnson, deceased, against the Transit Development Company. From a judgment for plaintiff and order denying motion for new trial, defendant appeals. Reversed, and new trial granted.

Argued before JENKS, P. J., and HIRSCHBERG, WOODWARD, BURR, and RICH, JJ.

D. A. Marsh, of Brooklyn, for appellant.

Don R. Almy, of New York City, for respondent.

JENKS, P. J. The plaintiff's intestate, when at work for his master, was killed by an explosion that followed a break in a steam pipe in the master's power house. This pipe, 5 inches in diameter, was joined with a 6-inch pipe by an elbow, thence extended horizontally for 15 feet to connection with a vertical pipe which led to a steam pump. Steam was carried from the 6-inch pipe through the horizontal pipe and the vertical pipe to the pump. The usual pressure of steam was from 180 to 185 pounds. Next to the junction of the said horizontal pipe and of the vertical pipe was a gate valve used to turn on or off the steam supplied through the vertical pipe to the steam pump. The steam had been thus turned off for five or six days while this steam pump was under repair. The plaintiff's intestate, a steam fitter of two years' service with the defendant, went up a ladder to the horizontal pipe, which was 10 feet above the floor, opened this gate valve, and the explosion followed, which rent the horizontal pipe at a point near the gate valve. The theory of the plaintiff, supported by proof and unchallenged, is that the steam in the horizontal pipe had been condensed to water, and that, when the steam was turned on, its action upon this water produced a blow upon the pipe technically called a "water hammer."

Two assignments of negligence were submitted to the jury: First, that the horizontal pipe should have been equipped with an automatic steam trap or traps, a device designed to draw off accumulations of water; and, second, that the pipe itself should have been heavier. The pipe was equipped with devices designed to draw off accumulations of water, called "bleeders," which were worked by hand, and the pipe was of a weight known as "standard." The plaintiff called several expert witnesses, who testified that the pipe should have been three-eighths instead of one-fourth of an inch thick, and should have been equipped with automatic steam traps; that if such devices had been provided the water hammer could not have been produced, or at least would have been harmless; and that, if the pipe had been of three-eighths thickness, its power of resistance would have been

increased one-half, so that a water hammer would not have rent the pipe. These witnesses condemned the device of bleeders, some pronounced them wholly inadequate under the conditions, and testified that automatic steam traps were in common and general use in and about the city of New York.

The proof adduced by the defendant may be summarized as follows: This apparatus had been worked for about three years, without accident of any kind. During that period steam had been shut off from this pipe for various times, for a few hours, a day and a night, and once for a week or fourteen days, and then had been turned into it without incident. When its power house was built at an outlay in excess of $5,000,000, the defendant, with the assistance of its electrical engineer, who was conversant with the men of the engineering world, after a canvass of various engineers, selected Mr. Murray, consulting engineer and then vice president and general manager of the New York Edison Company, a large and an important corporation, to prepare the plans and specifications for its apparatus, including the steam pump. This work was first done by Mr. Orrok, his assistant since 1899, who for 22 years had constructed and designed power stations, and who detailed many instances thereof. The plans and specifications were then passed on by Mr. Murray in a general way, and accepted by the defendant, which employed the Evans-Almirall Company to construct and to install the apparatus, which was done in conformity to the plans and specifications. The plaintiff did not challenge directly the repute, experience, or standing of the designer or the construction of the apparatus. Various witnesses who had been more or less concerned in the work, but who had technical knowledge which would have qualified them as experts, were called. One testified that the bleeder was the usual and customary and best method of drawing water from this pipe; that the automatic steam traps were not reliable; that their use for high pressure work was obsolete; or that, if they were installed, it was for sentimental reasons only, and then they were always reinforced by bleeders. Another testified that the location of these bleeders was good practice. Another testified that these bleeders were the proper method of drainage. Testimony was also given that the pipe was of proper thickness. And there was proof that the bleeders had been used at various times to drain the steam pipe, that the custom in the plant of the defendant was to use the bleeders to draw off the water before turning the gate valve to admit the steam. There was no proof that the servant had pursued this practice on the day in question before he opened the gate valve, but there was proof from the person in charge of the power plant that his examination, made 15 or 20 minutes after the accident, revealed that these bleeders were then closed. I think that the verdict against the defendant was not justified by the evidence.

[1] The question was whether the defendant was guilty of culpable negligence. The obligation of the defendant was to furnish an apparatus reasonably safe and proper, and in the discharge thereof it was required to exercise such care as would a man of ordinary pru-

dence with an eye to his own safety when seeking such an apparatus for his own use. Harley v. Buffalo Car Mfg. Co., 142 N. Y. 31, 36 N. E. 813. The testimony that although steam had been shut off from this pipe on several occasions, of which one was for a much longer period than elapsed before this accident, it had been returned to the pipe without incident, makes for the defendant. Burke v. Witherbee, 98 N. Y. 566; Stringham v. Hilton, 111 N. Y. 188, 18 N. E. 870, 1 L. R. A. 483. The evidence discloses that the plans and specifications for the apparatus were prepared by engineers of experience and repute, and were executed in conformity therewith by contractors of acknowledged experience and ability. Such a course in supply of the apparatus was not prohibited, but was that taken properly in countless cases when the plan and execution require technical learning and special skill. This case in this aspect falls within the rule enunciated in many cases, like Carlson v. Phœnix Bridge Co., 132 N. Y. 273, 30 N. E. 750; Harley's Case, supra; Doyle v. White, 9 App. Div. 521, 35 N. Y. Supp. 760, 41 N. Y. Supp. 628, affirmed on opinion 159 N. Y. 548, 54 N. E. 1090; Reynolds v. Merchants' Woolen Co., 168 Mass. 501, 47 N. E. 406; Fuller v. N. Y., etc., R. R. Co., 175 Mass. 424, 56 N. E. 574; Smith v. N. Y. C. & H. R. R. Co., 164 N. Y. 491, 58 N. E. 655; Service v. Shoneman, 196 Pa. 63, 46 Atl. 292, 69 L. R. A. 792, 79 Am. St. Rep. 689; Ardesco Oil Co. v. Gilson, 63 Pa. 146. As the master was not an insurer of the servant, it was not a guarantor to him of the work of the designer or the constructor of the plant. Reynolds v. Merchants' Woolen Co., supra. The selection of those who planned and executed the work of furnishing the apparatus is to be tested by the inquiry whether the master had exercised the degree of care which I have described heretofore.

[2] The learned counsel for the respondent insists that defendant cannot invoke this rule familiarly known as that of "the reputable manufacturer," for two reasons: First. Because it is "admitted" that the plant as purchased and designed was defective. But the specific citation to the record does not show such admission, and the testimony does not justify such conclusion. It does appear that subsequent to the installation of the plant, and about a year prior to the casualty, the defendant installed a second bleeder. But there was no proof, direct or inferential, that any original defect was thus cured. Such action may indicate an improvement, but an additional step towards perfection or for precaution is not taken at the penalty of an "admission" that the apparatus was inadequate or as originally installed was not reasonably safe and proper. And, second, the rule may not be invoked, because, if plaintiff's witnesses were to be believed, their method was the only practical device that could have been employed. Assume that the jury did thus believe these experts, nevertheless, the question remains whether the evidence adduced by the plaintiff was sufficient to show a breach of the obligation of the master, in view of the uncontradicted testimony as to his care in selection of the engineers who prepared the plans and of the constructor who executed them, whose repute and standing were established and

indeed were not even attacked, and the testimony of witnesses of technical skill and experience certainly equal to that of the plaintiff's experts, who approved of the devices designed for the same purpose as were the automatic traps. Concede that the jury did not believe that the bleeders were a proper device, yet, in testing the discharge of the obligation by the master, it had the proof that the bleeders were included in the plans and specifications furnished to the master as adequate and proper by men of repute and of standing in their profession. The jury may have been convinced that the engineers erred in selection of the bleeders, that the bleeders were inadequate, that the automatic trap was in general use, but the ultimate question was whether the master was culpably negligent in procuring such plans and specifications with bleeders, but without automatic traps. And, moreover, as I have said, up to the day of the accident, there is lack of any proof whatever that the bleeders had not been sufficient under similar conditions.

[3] The liability of the master does not abide the judgment of a jury that he could have furnished a safer apparatus, or that the apparatus furnished in the method adopted in this case lacked devices or construction which could have prevented the accident. The master may have, in the opinion of the jury, erred in judgment, but that is not enough. It has been frequently pointed out that the evidence in one case might convince the jury that one kind of apparatus was the better, and the evidence in another case might convince the jury that some other kind was preferable, for in any case "it is easy to find persons who will testify that from their experience and observation some other kind was better." Harley v. Buffalo Car Mfg. Co., supra, 142 N. Y. 36, 36 N. E. 814. It often happens, and I speak generally, that a battle of experts whose fervor lends them to advocacy diverts the jury from triers of the issues to become judges of a partisan professional dispute over rival systems, and to find against a party because their conclusion is against his experts and in favor of those of his opponent. To reiterate, the case did not turn upon the question whether the jury believed the experts who pronounced that the devices recommended by them were the sole adequate appliances, but upon the question whether the defendant was culpably negligent in its supply of the apparatus.

[4] The respondent insists that the verdict can be upheld for a negligent location of the pipe in relation to other parts of the apparatus. The court, however, limited the issue as submitted to the two features of alleged negligence which I have discussed, without objection or demur on the part of the plaintiff and without his request for any other submission or instruction.

I advise the reversal of the judgment and the granting of a new trial.

Judgment and order reversed and new trial granted, costs to abide the event. All concur.